IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **KENNETH LEMIEUX** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NUMBER:** |
| **v.** ) | |
| ) | <u>**3:20-CV-00741-JBA**</u> |
| **STRATEGIC FINANCIAL** ) | |
| **SOLUTIONS, LLC, and** ) | |
| **ANCHOR CLIENT SERVICES, LLC** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>SECOND CORRECTED COMPLAINT</u>

For this Complaint, the Plaintiff, by undersigned counsel, states as follows:

### <u>PREAMBLE</u>

Plaintiff files this, his Second Corrected Complaint to correct the misnomer of "Strategic Client Solutions, LLC" to the correct name of the defendant "Strategic Financial Solutions, LLC". No other changes or corrections have been made.

### <u>JURISDICTION</u>

1.

This action arises out of the Defendants' violation of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679; the Electronic Fund Transfers Act ("EFTA"), 15 U.S.C. § 1693k; the Connecticut Debt Negotiators Act, Conn. Gen. Stat. §36a-671 ("CDNA"); the Connecticut Debt Adjusters Act, Conn. Gen. Stat § 36a-655 ("CDAA"); the Connecticut Home Solicitation Sales Act, Conn. Gen. Stat. § 42-134a ("CHSSA"); and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, and it also involves claims for conversion pursuant to common law and Conn. Gen. Stat. § 52-564, and common law breach of contract.

## PARTIES, JURISDICTION AND VENUE

2.

The Court has jurisdiction pursuant to 15 U.S.C. § 1679g; 28 U.S.C. §1 331, § 1337 and § 1367.

3.

Plaintiff is a natural person who resides at 111 Ledgewood Road, Groton CT 06340.

4.

Defendant Strategic Financial Solutions, LLC ("Strategic") is a Nevada limited liability company with a place of business at 875 Avenue of the Americas #501, New York, N.Y 10001.

5.

Strategic's registered agent is C.T. Corporation and may be served with Summons and a copy of this Complaint at 701 South Carson Street, Suite 200, Carson City, Nevada 89701.

6.

Defendant Anchor Client Services, LLC ("Anchor Services" and together with Defendant Strategic, the "Defendants") is a Delaware limited liability company with a place of business at 25 Robert Pitt Drive, Suite 204, Monsey, New York, 10952.

7.

Anchor Services' registered agent is Anchor Client Services, LLC and may be served with Summons and a copy of this Complaint at 25 Robert Pitt Drive, Suite 204, Monsey, New York, 10952.

## RELEVANT FACTS

8.

Defendants represented that they could settle Plaintiff's debts for a fraction of what was owed but failed to do so and instead lined their pockets with Plaintiff's money rather than assisting

him. Defendants claimed they "provide[] comprehensive debt relief services for people in difficult financial circumstances. . . . [I]ts personalized, tailored approach . . . includes debt consolidation loans and debt resolution programs."

9.

Defendants' self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

10.

Defendants create and maintain a collection of entities being held out as law firms (collectively, "Façade Firms"). It does so with the complicity of lawyers in various states for the purpose of evading laws (including the CDNA and the CCNA) meant to limit the activities of non-lawyer debt settlement companies and to falsely create an aura of trustworthiness that will attract and entrap consumers.

11.

Defendants funded, operated, managed or affiliated with the following Façade Firms that purport to be able to settle consumers' debts: Anchor Law Group, Golden Law LLP, Option 1 Legal, Heartland Legal Group, Ascend Legal Group, Harbor Legal Group, Crimson Legal Group, Monarch Legal Group, Colonial Law Group, Rockwell Legal Group, Pioneer Law Firm, Frontier Consumer Law Group and/or Boulder Legal Group.

12.

The attorney network here is composed of a confusing and overlapping array of Façade Firms. Although the Façade Firms are set up as LLCs, they are "trade names" under state bar rules

because the name of the firm does not contain the name of an attorney. In states where trade names are not permitted, the minority member uses the name of his or her own firm.

13.

Defendants assign Connecticut matters to a stable of attorneys, including but not limited to Robin Hughes Lasky, Jefferson Hanna III, Sarah Anne Olson, Peter J. Herrmann and Daniel Ruggiero. Other attorneys are recruited for the purpose of making it appear that the Façade Firm is multi-jurisdictional.

14.

Although the in-state attorneys serve as the Façade Firm's purported licensed attorney in that state, they do not oversee or manage any negotiations or other legal work for any clients in their state.

15.

The "in-state attorneys" do not know the identity of the Façade Firm clients unless and until they are called on to appear in court for the client.

16.

The Defendants elicited Plaintiff's business by post card or other mailing.

17.

All debt resolution contracts operated or managed by the Defendants are entered into with Connecticut residents and are signed by the consumer in person at a location in Connecticut that: (i) are not any of the Defendants' places of business; and (ii) are before a traveling notary who not only witnesses the signature but is also mandated by Defendants to make oral disclosures to the consumer.

18.

Defendants' program was not a bona fide credit counseling service.

19.

Plaintiff's estimated debt was $40,723.00 on five outstanding accounts.

20.

Defendants' estimated fees were $29,724.17.

21.

Plaintiff was expected to and did, start making payments to one or more of the Defendants before any services were rendered.

22.

Monthly payments included a monthly retainer fee, for the first eight months totaling $900.00; a monthly service cost of $314.68; a legal administration fee of $89.00 per month; and banking fees of $10.95 per month all beginning 6/29/2018.

23.

Defendants conditioned its agreement to provide services on Plaintiff agreeing in advance to make payment by means of preauthorized "electronic fund transfers" from his account with a financial institution as such terms are defined in EFTA.

24.

On or about 3/29/19, at which time Plaintiff had paid over $6,000.00, he was informed that he had a settlement reserve of $1,135.35 out of which Defendants were to pay Plaintiff's creditors and the rest of his payments went to fees and service costs.

25.

Despite its promises, Defendants did not resolve, or attempt to resolve, any of the past due accounts of Plaintiff as specifically identified by Plaintiff to the Defendants on a creditor list ("Creditor List") which formed part of the understanding Plaintiff had with the Defendants as to the services that were to immediately begin to be rendered.

26.

On or about April 16, 2019 Plaintiff alerted Defendants that he had received a highly favorable settlement offer from a representative of Elan Financial Services ("Elan"), one of the creditors listed on his Creditor List.

27.

Plaintiff instructed the Defendants on or about the same time to accept the offer from Elan or let him know immediately if they could get a better offer.

28.

On Thursday April 18, 2019 Plaintiff received an automated reply from Defendants and their agents (i) indicating that they had received his "legal correspondence;" (ii) informing him the matter was being assigned to a "Litigation Agent" and that it would take 7-10 days for them to respond to his paperwork.

29.

Despite being promised that he would be "contacted by phone by a litigation agent," such contact was neither attempted nor occurred by the Defendants or their agents.

30.

Plaintiff repeatedly attempted to contact the Defendants and their agents regarding their attempts to resolve the Elan debt, including on April 30, May 2, and May 3rd, 2019 to no avail.

31.

Plaintiff's contract identified Mr. Peter J. Herrmann ("Herrmann") as his contact. Herrmann was and is an employee of one or both of the Defendants.

32.

Since 2016, Herrmann has been employed by the Defendant Strategic, as a sales representative.

33.

Former employee, Emily Butler, was an "Attorney Model Negotiation Specialist" for Strategic since October 2018, who claims to have worked for Anchor Law Firm – October 2018, Rockwell Legal Group -November 2018-December 2019, Pioneer Law Firm, January – 2019.

34.

Despite being promised that he would be "contacted by phone by a litigation agent," Plaintiff never received any response to his request for assistance from Herrmann or any other employee of either of the Defendants or their agents.

35.

After being unable to get assistance from the Defendants in connection with settling the Elan debt, Plaintiff demanded a refund of his money.

36.

After demanding a refund and cancellation of his contract, Plaintiff had unsuccessful emails exchanges and conversations with Defendants' Attorney Patrick Wilczak ("Attorney Wilczak"), who purported to represent an Arkansas law firm, but at the time the New York State Bar Directory lists him as employed by Strategic Financial Solutions, LLC 711 3d Ave, 6th floor, New York, NY 10017-4029.

37.

Based on information and belief, since 2016, Attorney Wilczak has been employed as a sales representative for Strategic or its affiliates.

38.

Attorney Wilczak demanded that Plaintiff sign a release to "members, equity-holders, managers, agents, employees, vendors and attorneys" before his money would be released or refunded back to him.

39.

Attorney Wilczak refused to explain to the Plaintiff who would benefit from the release, including identifying that it would apply to Defendants and their employees and agents including Mr. Herrmann, Thomas Rogus and himself.

40.

Plaintiff refused to sign the proposed release sent to him by the Defendants.

41.

After being unable to get assistance in connection with settling the Elan debt, Plaintiff filed a complaint on or about September 25, 2019 with the State of Connecticut Department of Banking, the Consumer Financial Protection Bureau and the Federal Trade Commission (the "Complaints"). See Exhibit A

## **THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679**

42.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

(2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679(b).

43.

Plaintiff is a consumer within the definition of CROA. 15 U.S.C. § 1679(a)(1).

44.

Each of the Defendants is a "credit repair organization" within the definition of CROA, as each Defendant is:

[a] person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

15 U.S.C. § 1679a(3)(A).

45.

As stated previously, Defendants' self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

46.

Under CROA, "No person may . . . make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b(a)(3).

47.

CROA states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b(b).

48.

Defendants repeatedly made untrue and misleading representations to Plaintiff in violation of CROA by informing Plaintiff that Defendants would settle his debts with his creditors, but instead Defendant intended to and did line their pockets with Plaintiff's money while doing little or nothing to truly assist Plaintiff or improve his credit.

49.

Further, Defendants violated CROA by paying themselves over $5,000.00 in fees by July, 2019, leaving only a mere $1,135.00 of Plaintiff's money to settle any debts.

50.

CROA states that

> Any person who fails to comply with any provision of this title [15 U.S.C. §§ 1679 *et seq*.] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:
>
> > (1) Actual damages. The greater of—
> >
> > > (A) the amount of any actual damage sustained by such person as a result of such failure; or
> > >
> > > (B) any amount paid by the person to the credit repair organization.
> >
> > (2) Punitive damages.
> >
> > > (A) Individual actions. In the case of any action by

an individual, such additional amount as the court
may allow.

15 U.S.C. § 1679g(a).

51.

Plaintiff has suffered actual damages under CROA as a result of one or more the
Defendants' actions.

52.

Plaintiff is entitled to recover his actual damages as well as punitive damages from
Defendants under CROA.

**ELECTRONIC FUNDS TRANSFER ACT, 15 U.S.C. § 1693k**

**53.**

Plaintiff had a consumer account with one or more of the Defendants as that term is defined
in EFTA.

54.

One or more of the Defendants are a "financial institution" for purposes of EFTA as they
are "person[s] that directly or indirectly holds an account belonging to a consumer." See
Regulation E. 12 C.F.R. § 1005.3(a), §1005.3(b), §1005.10(b), §1005.2(i).

55.

EFTA provides that no agreement "between a consumer and any other person may contain
any provision which constitutes a waiver of any right conferred or cause of action created by
[EFTA]" 15 U.S.C. §1693l.

56.

Defendants and/or its agents required Plaintiff to agree to provide Defendants and or their
agents with written authorization to process pre-authorized electronic funds transfer that was to

"remain effective until cancelled by Client in writing, at least five (5) business days prior to the scheduled payment due date." See Exhibit B (Sec. 5.2(d) of document)

57.

Defendants conditioned its services on Plaintiff's agreeing to make payment by means of preauthorized electronic fund transfers from his consumer account at a financial institution as such terms are defined in EFTA.

58.

Defendants were obligated under EFTA to provide Plaintiff with a copy of any written authorization at the time the authorization was provided. See 15 U.S.C. § 1693(c); 12 C.F.R. § 1005.10(b).

59.

Defendants violated EFTA by requiring Plaintiff to give notice in writing in order to cancel a pre-authorized electric funds transfer from his consumer account.

60.

Defendants violated EFTA by failing to give the Plaintiff a copy of the written authorization form at the time it was provided.

61.

EFTA provides that

> Any person . . . who fails to comply with any EFTA provision is liable under 15 U.S.C. § 1693m for the sum of:
>
> 1.  Any actual damages sustained by the consumer;
>
> 2.  Statutory damages in an individual case of not less than $100 nor greater than $1,000 . . .
>
> 3.  The costs of the lawsuit together with reasonable attorney's fee.

15 U.S.C. § 1693m(a).

62.

Defendants are therefore liable to Plaintiff for his damages, costs and reasonable attorney's

fees under 15 U.S.C. § 1693m of EFTA.

**<u>CONNECTICUT DEBT NEGOTIATORS ACT, CONN. GEN. STAT. § 36a-671</u>**

63.

Plaintiff is a "debtor" within the definition of the Connecticut Debt Negotiators Act

("CDNA"). Conn. Gen. Stat. Ann. § 36a-671(a)(5).

64.

The CDNA defines "debt negotiation" as follows:

> "Debt negotiation" means, for or with the expectation of a fee, commission or other valuable consideration, assisting a debtor in negotiating or attempting to negotiate on behalf of a debtor the terms of a debtor's obligations with one or more mortgagees or creditors of the debtor, including the negotiation of short sales of residential property or foreclosure rescue services.

Conn. Gen. Stat. Ann. § 36a-671(a)(4).

65.

The CDNA provides that:

> (b) No person shall engage or offer to engage in debt negotiation in this state unless such person has first obtained a license for its main office and for each branch office where such business is conducted in accordance with the provisions of sections 36a-671 to 36a-671f, inclusive.
>
> . . .
>
> A person is engaging in debt negotiation in this state if such person: (1) Has a place of business located within this state; (2) has a place of business located outside of this state and the debtor is a resident of this state who negotiates or agrees to the terms of the services in

Page 13 of 24

> person, by mail, by telephone or via the Internet; or (3) has its place
> of business located outside of this state and the services concern a
> debt that is secured by property located within this state.

Conn. Gen. Stat. Ann. § 36a-671(b).

66.

At all relevant times, one or both Defendants were engaged in debt negotiation in the State

of Connecticut for purposes of in Conn. Gen. Stat. Ann. § 36a-671(b) because Plaintiff is a resident

of this state and he was sold services in person in his home by an employee or agent of the

Defendants.

67.

Defendants failed to obtain a license with the State of Connecticut to conduct debt

negotiation for its main office and for each branch office where such business is conducted as

required by Conn. Gen. Stat. Ann. 36a-671 et seq.

68.

The CDNA further provides:

> A debt negotiator shall provide to each debtor a contract that shall
> include a complete, detailed list of services to be performed, the
> costs of such services and the results to be achieved. Each debt
> negotiation service contract shall contain (1) a statement certifying
> that the person offering debt negotiation services has reviewed the
> consumer's debt, and (2) an individualized evaluation of the
> likelihood that the proposed debt negotiation services would reduce
> the consumer's debt or debt service or, if appropriate, prevent the
> consumer's residential home from being foreclosed. Each contract
> shall allow the consumer to cancel or rescind such contract within
> three business days after the date on which the consumer signed the
> contract. Such contract shall contain a clear and conspicuous caption
> that shall read, "Debtor's three-day right to cancel", along with the
> following statement:  "If you wish to cancel this contract, you may
> cancel by mailing a written notice by certified or registered mail to
> the address specified below. The notice shall state that you do not

> wish to be bound by this contract and must be delivered or mailed before midnight of the third business day after you sign this contract."

Conn. Gen. Stat. Ann. § 36a-671b(a).

68.

Defendants have failed to comply with the requirements of Conn. Gen. Stat. Ann. § 36a-671b(a).

70.

The CDNA states that "[a]ny contract that does not comply with the provisions of this section shall be voidable by the consumer." Conn. Gen. Stat. Ann. § 36a-671b(c).

71.

Plaintiff has previously validly exercised his right to void any contract he had with the Defendants and/or their agents or affiliates.

**CONNECTICUT DEBT ADJUSTERS ACT, CONN. GEN. STAT § 36a-655**

72.

The Connecticut Debt Adjusters Act ("CDAA") defines debt adjustment as follows:

> "Debt adjustment" means, for or with the expectation of a fee, commission or other valuable consideration, receiving, as agent of a debtor, money or evidences thereof for the purpose of distributing such money or evidences thereof among creditors in full or partial payment of obligations of the debtor.

Conn. Gen. Stat. Ann. § 36a-655(5).

73.

Plaintiff is a "debtor" within the definition of the CDAA. Conn. Gen. Stat. Ann. § 36a-655(6).

74.

The CDAA states that "No person shall engage in the business of debt adjustment in this state unless such person has first obtained a license for the main office and for each branch office where such business is conducted in accordance with the provisions of sections 36a-655 to 36a-665, inclusive." Conn. Gen. Stat. Ann. § 36a-656(a).

75.

During the relevant time period, none of the Defendants and/or their agents, affiliates, or subsidiaries were licensed in the State of Connecticut to perform debt adjustment services pursuant to the CDAA.

76.

The CDAA requires, *inter alia*, that the debt adjuster:

> (1) Provide the debtor with a written agreement that sets forth the services to be provided by the licensee and any fees to be charged for such services;

> (2) provide individualized credit counseling and budgeting assistance to the debtor without charge prior to entering into a written agreement with the debtor;

> (3) determine that the debtor has the financial ability to make the payments stated in the written agreement and that the payments stated in the written agreement are suitable for the debtor;

> (4) contact each creditor of the debtor to determine whether such creditors will accept payment of the debtor's debts as contemplated by the written agreement;

> . . .

> (6) make remittances to creditors within a reasonable time after receipt of any funds, less prorated fees and costs, unless the reasonable payment of one or more of the debtor's obligations requires that such funds be held for a longer period so as to accumulate a sum certain;

Conn. Gen. Stat. Ann. § 36a-660.

77.

One or more of the Defendants or their agents failed to perform the previously enumerated

duties and requirements of the CDAA.

78.

Among the prohibited acts of the CDAA are:

> No person who is required to be licensed and who is subject to the provisions of sections 36a-655 to 36a-665, inclusive, and no control person shall, directly or indirectly:
>
> . . .
>
> (6) advertise, display, distribute, broadcast or televise or permit to be displayed, advertised, distributed, broadcast or televised the licensee's services, rates or terms in any manner whatsoever wherein any false, misleading or deceptive statement or representation is made with regard to the services to be performed by the licensee or the charges to be made therefor;
>
> (7) employ any scheme, device or artifice to defraud or mislead any person in connection with a debt adjustment;
>
> (8) engage in any unfair or deceptive practice toward any person in connection with debt adjustment activities;
>
> (9) obtain property by fraud or misrepresentation;
>
> (10) fail to comply with the provisions of sections 36a-655 to 36a-665, inclusive, or regulations adopted under said sections, or any other state or federal law, including the rules and regulations thereunder;

Conn. Gen. Stat. Ann. § 36a-661.

79.

The CDAA, at Conn. Gen. Stat. Ann. § 36a-661a(b), states "If any person is not licensed

as required by section 36a-656, the written agreement is voidable by the debtor."

80.

The Defendants are not licensed to perform debt adjustment services in Connecticut.

81.

Plaintiff has validly voided any contracts or agreements that he may have had with one or more of the Defendants or their agents or affiliates.

## CONNECTICUT HOME SOLICITATION SALES ACT, CONN. GEN. STAT. § 42-134a

82.

The Connecticut Home Solicitation Sales Act ("CHSSA") defines home solicitation as:

> "[A] sale, lease, or rental of consumer goods or services, whether under single or multiple contracts, in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller.

Conn. Gen. Stat. Ann. § 42-134a(a).

83.

Defendants solicited Plaintiff by mail regarding its credit repair/debt adjusting services touting those services.

84.

Plaintiff responded to the advertisement and subsequently met with Defendant Herrmann, a traveling notary, at a place that was not either of the Defendants' place of business, and signed Defendants' contract before Defendant Herrmann, who was acting as a the traveling notary, who not only witnessed Plaintiff's signature, but also made oral representations, warranties and disclosures to Plaintiff regarding the scope and nature of the services to be provided by the Defendants.

85.

CHSSA mandates that the seller must notify the buyer in multiple ways that the buyer has a right to cancel the sale, both orally and in writing. <u>See</u> Conn. Gen. Stat. Ann. § 42-135a.

86.

In failing to notify Plaintiff of his right to cancel the home solicitation sale, Defendants' contract with Plaintiff is null and void.

87.

The CHSSA provides that "within ten business days after a home solicitation sale has been cancelled the seller shall tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness." Conn. Gen. Stat. Ann. § 42-138(a).

88.

Plaintiff was not refunded his money within ten business days of Plaintiff cancelling the home solicitation sale in violation of CHSSA.

89.

Violations of the CHSSA is a crime. As stated in Conn. Gen. Stat. Ann. § 42-141:

> a) Any person who violates any provision of this chapter shall be guilty of a class C misdemeanor. Any sale made in respect to which a commission, rebate or discount is offered in violation of the provisions of this chapter shall be voidable at the option of the buyer.

> (b) Violation of any of the provisions of sections 42-135a, or 42-137 to 42-139, inclusive, or failure to honor any provisions of the notice of cancellation required by this chapter shall constitute an unfair or deceptive act or practice as defined by section 42-110b.

90.

As stated in subsection (b) of Conn. Gen. Stat. Ann. § 42-141, a violation of the CHSSA also constitutes a violation of Connecticut Unfair Trade Practices Act ("CUTPA"), as discussed *infra*.

## CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42 110a

91.

The Connecticut Unfair Trade Practices Act ("CUTPA"), states:

(a) No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

(b) It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended.

. . .

(d) It is the intention of the legislature that this chapter be remedial and be so construed.

Conn. Gen. Stat. Ann. § 42-110b.

92.

The Plaintiff and the Defendants are considered "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

93.

The alleged conduct by the Defendants and their agents, constitutes a deceptive act or practice in the commencement of trade or commerce, as defined in Conn. Gen. Stat. Ann.

§ 42-110b(a), in that said conduct constitutes a material misrepresentation or omission, likely to mislead a consumer acting reasonably under the circumstances.

94.

The Defendants' and their agents' conduct deprived the Plaintiff from his benefit of the bargain with the Defendants, which was that Defendants' performance of its obligations under their agreement would be in accordance with both Federal and State law.

95.

Because CHSAA § 42-141(b) expressly provides that a violation of the CHSSA also constitutes a violation of Connecticut Unfair Trade Practices Act ("CUTPA"), Defendants have violated CUTPA by their actions.

96.

As a result of the Defendants' conduct, the Plaintiff has suffered an ascertainable loss of money or property for purposes of CUTPA, including the loss of time and inconvenience.

97.

As a result of the Defendants' actions, in violation of CUTPA, Defendants are liable to the Plaintiff for actual and punitive damages thereunder.

98.

Defendants and their agents have committed unfair methods of competition by directly competing against legitimate licensed debt adjusters and debt negotiators in this State by Defendants operating an illegal debt negotiation and debt adjustment business in this State.

99.

Defendants have further committed violations of the CUTPA by using unfair and deceptive acts and practices towards Plaintiff in informing Plaintiff that Defendants would work with his

creditors and rapidly lower his debt ratio, when in fact, Defendants and/or their agents collectively kept the lion's share of Plaintiff's funds for themselves.

100.

The CUTPA further states:

> (a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.
>
> . . .
>
> (d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery. . . . any action brought under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief.
>
> . . .
>
> (g) In any action brought by a person under this section there shall be a right to a jury trial except with respect to the award of punitive damages under subsection (a) of this section or the award of costs, reasonable attorneys' fees and injunctive or other equitable relief under subsection (d) of this section.

Conn. Gen. Stat. Ann. § 42-110g.

101.

Thus, Defendants are liable to Plaintiff for actual damages, punitive damages, costs and attorneys' fees pursuant to the CUTPA.

## CONVERSION

### 102.

The aforesaid actions of the Defendants constitute conversion.

### 103.

Plaintiff had a consumer account with one or both Defendants or their agents.

### 104.

Plaintiff has paid over $6,000.00 into his account with one or both of the Defendants or their agents some or all of which was to be held for his benefit.

### 105.

The Defendants appropriated Plaintiff's money and deposited into their own account and where Plaintiff had no access to the funds, to the exclusion of his rights.

### 106.

The money has not been returned to the Plaintiff, and Plaintiff no longer has access to his money.

### 107.

The aforesaid actions of the Defendants constitute conversion.

## STATUTORY THEFT, Conn. Gen. Stat. Ann. § 52-564.

### 108.

The Defendants have committed the foregoing actions with intend to deprive the Plaintiff of his money.

### 109.

Defendants are therefore liable to Plaintiff under Conn. Gen. Stat. § 52-564.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff respectfully requests the following:

a) That process issue and that the Defendants be served with Summons and a copy of this Complaint;

b) That the contract between the Defendants and/or their agents and Plaintiff be held void and unenforceable pursuant to the provisions of CDNA (Conn. Gen. Stat. Ann. § 36a-671b(c)), CDAA (Conn. Gen. Stat. Ann. § 36a-661a(b)) and CHSSA (Conn. Gen. Stat. Ann. § 42-135a);

c) That Plaintiff be awarded a judgment against Defendants for their multiple violations of the various consumer protection laws outlined herein;

d) That Plaintiff be awarded damages for Defendants' violations of CROA and CUTPA, based on the facts alleged or provided in discovery; including statutory, compensatory, treble and punitive damages in excess of $25,000.00 pursuant to Conn. Gen. Stat. Ann. § 42-110g(a);

e) That this Court award the Plaintiff costs of suit and reasonable attorneys' fees and costs pursuant to Conn. Gen. Stat. Ann. § 42-110g(d);

f) That Plaintiff have a trial by jury; and

g) That this Court award such other and further relief as law or equity may provide.

Respectfully submitted, this 15th day of June, 2020.

**ERIC LINDH FOSTER LAW, LLC**

/s/  Eric L. Foster

By: ERIC L. FOSTER
Juris No.: ct29740
48 Main Street
Old Saybrook, CT 06475
Tel: (203) 533-4321
Fax: (203) 738-1024
efoster@lindhfoster.com
**ATTORNEY FOR PLAINTIFF**